UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

DAYOUB MARKETING, INC.,                 :

                      Plaintiff,        :     04 Civ. 1881 (GBD)(HBP)

     -against-                          :     REPORT AND
                                              RECOMMENDATION
SEVEN SEAS TRADING CO., INC.,           :
d/b/a VALLEY VIEW FARMS, ABRAHAM
TAN, in his individual capacity,        :
and KAI WING CHEUNG, in his
individual capacity,                    :

                      Defendants.       :

----------------------------------X

          PITMAN, United States Magistrate Judge:


          TO THE HONORABLE GEORGE B. DANIELS, United States

District Judge,


I.  Introduction


          On September 22, 2005, the Honorable George B. Daniels,

United States District Judge, entered a default judgment in favor

of plaintiff Dayoub Marketing, Inc. ("Dayoub"), after defendants

failed to respond to plaintiff's motion for summary judgment

filed July 7, 2005 (Default Judgment Pending Inquest, dated Sept.

22, 2005 (Docket Item 40)).  Judge Daniels then referred this

consolidated matter to the Honorable Douglas F. Eaton, United

States Magistrate Judge for the Southern District of New York, to

conduct an inquest and to issue a report and recommendation

concerning the amount of damages to be awarded to Dayoub (Default Judgment Pending Inquest, dated Sept. 22, 2005 (Docket Item 40); Order of Reference, dated Nov. 14, 2005 (Docket Item 41)).  The matter was subsequently reassigned to me for the same purpose (Notice of Reassignment, dated Nov. 29, 2005 (Docket Item 42)).

        Pursuant to the Order of Reference, I issued a Scheduling Order on January 17, 2006.  In compliance with that Order, Dayoub served and filed proposed findings of fact and conclusions of law on February 14, 2006, and defendants submitted responsive materials on March 14, 2006, in which they requested that I conduct an evidentiary hearing concerning three of the invoices that Dayoub proffered concerning the amount owed by defendants. I conducted that hearing on May 4, 2006, and following the hearing, both sides submitted post-hearing briefs.  Accordingly, on the basis of the Complaint, the parties' written submissions and the evidence offered at the hearing, I recommend that the Court make the following findings of fact and conclusions of law.

II.  <u>Findings of Fact</u>

    A.  <u>The Parties</u>

    1.  Plaintiff, Dayoub, is a company with business offices in Fredonia, New York (Complaint ("Compl.") ¶ 1; Answer ¶ 1).  Dayoub sells wholesale quantities of perishable produce in interstate commerce (Compl. ¶ 2; Answer ¶ 2).  Dayoub is and was

2

at all relevant times a "dealer" of produce, as that term is defined in the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. §§ 499a-499q (2000), licensed by the United States Department of Agriculture (the "USDA") (Plaintiff's First Set of Requests for Admission of Facts and Genuineness of Documents, dated Oct. 28, 2004, and Statement in Reply to Request for Admissions Directed to Defendant Seven Seas, dated Mar. 14, 2005 (collectively, "Req. & Resp."), No. 1, annexed as part of Group Exhibit A, which, in turn, is annexed to Plaintiff's Proposed Findings of Fact and Conclusions of Law (Docket Item 44) ("Pl.'s Prop. Findings")).  Helen Sam is the Office Manager of Dayoub (Transcript of Hearing Conducted Before the Undersigned on May 4, 2006 ("Tr.") 3).

        2.   Defendant Seven Seas Trading Co., Inc. ("Seven Seas"), d/b/a Valley View Farm, was a company with business offices in New York, New York, Brooklyn, New York and Santa Maria, California (Defendants' Hearing Exhibit ("Defs.' Hr'g Ex.") A).  When it was operating, Seven Seas purchased and resold perishable produce in wholesale quantities (Compl. ¶ 3(a); Answer ¶ 3(a)).  Seven Seas ceased operating in February 2002 (Tr. 71).

        3.   Defendant Abraham Tan has been the president and sole owner of Seven Seas since 1988 (Tr. 67; Tan Decl. ¶ 1).

        4.   Defendant Kai Wing Cheung was a Vice President of Seven Seas, at least from March 20, 2001 through May 12, 2001

3

(Req. & Resp. No. 5, annexed as part of Group Ex. A to Pl.'s
Prop. Findings).  Cheung actively participated in the business
operations of the Chinese produce department of Seven Seas, and
received a salary or other form of compensation from Seven Seas.
(Req. & Resp. Nos. 72, 74, annexed as part of Group Ex. A to
Pl.'s Prop. Findings).  I shall refer to Seven Seas, Tan and
Cheung collectively as "defendants."

    B.   <u>Past Dealings Between Seven Seas and Dayoub</u>

     5.  Seven Seas regularly purchased produce from Dayoub
for several years prior to 2001, possibly for as long as 10 or 15
years (Tr. 22).

     6.  The vast majority of purchases that Seven Seas made
from Dayoub throughout their business relationship were for a
"fixed price" (<u>see</u> Tr. 23).

     7.  In fixed price purchases, Seven Seas and Dayoub
would orally negotiate an agreement under which Dayoub would ship
a specific amount of produce to Seven Seas at a specified price
per unit.  The produce would then be shipped, along with a bill
of lading stating the date of shipment, the origin and destina-
tion of the shipment.  Upon arrival, Seven Seas would have the
opportunity to inspect the produce prior to acceptance.  Within a
few days of shipment, Dayoub would send a confirmatory invoice to

4

Seven Seas indicating the amount purchased, the purchase price, and the amount due.

    C.  <u>Fixed Price Purchases at Issue</u>

    8.  There are seven fixed price purchases of green cabbage in issue in this case:

| Invoice Date | Invoice Number | Claimed Current Balance Due |
|---|---|---|
| March 20, 2001 | 02840-03 | $ 2,600.00 |
| March 29, 2001 | 02926-01 | $ 1,560.00 |
| March 31, 2001 | 02955-03 | $ 1,155.00 |
| April 16, 2001 | 2001-0118-01 | $ 1,800.00 |
| April 27, 2001 | 2001-0195-03 | $ 2,040.00 |
| April 30, 2001 | 2001-0270-02 | $ 3,600.00 |
| May 2, 2001 | 2001-01278-02 | $ 1,050.00 |
| | Total | $13,805.00 |

(Invoices annexed as Undesignated Exhibits to the Declaration of Helen Sam in Support of Plaintiff's Motion for Summary Judgment, dated July 6, 2005 ("Sam Decl."), annexed, in turn, as part of Group Ex. A to Pl.'s Prop. Findings).

    9.  Seven Seas admits that it received the invoices listed in the preceding paragraph (Req. & Resp. Nos. 9, 33, 39, 45, 51, 57, 63, annexed as part of Group Ex. A to Pl.'s Prop. Findings).

    10.  Seven Seas also admits that Dayoub proffered true, correct and accurate copies of said invoices to this Court (Req. & Resp. Nos. 7, 31, 37, 43, 49, 55, 61, annexed as part of Group Ex. A to Pl.'s Prop. Findings), and it did not object when they

were offered in evidence (Req. & Resp. Nos. 11, 35, 41, 47, 53, 59, 65, annexed as part of Group Ex. A to Pl.'s Prop. Findings).

      11.   The invoices all state on their face, "Payment Terms:  Net 10 Days," just below the invoice date (Invoices annexed as undesignated exhibits to Sam Decl., annexed as part of Group Ex. A to Pl.'s Prop. Findings).

      12.   The invoices also state on their face:

> The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust autho-rized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)).  The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received

(Invoices annexed as Undesignated Exhibits to Sam Decl., annexed, in turn, as part of Group Ex. A to Pl.'s Prop. Findings).  I shall refer to this quoted language as the "PACA Trust Terms."

      13.   The invoices also state, below the PACA Trust Terms:

> In the event collection actions become necessary, buyer agrees to pay seller's costs and expenses of collec-tion, including attorneys' fees, until account balances are paid in full.  Interest shall accrue on any past due balance at the rate of 1.5% per month (18% per annum)

(Invoices annexed as Undesignated Exhibits to Sam Decl., annexed, in turn, as part of Group Ex. A to Pl.'s Prop. Findings).  I shall refer to this quoted language as the "Additional Contract Terms."

6

14.   According to Sam, Seven Seas was obligated to pay the invoice price in full within ten days of its acceptance of a shipment, and Seven Seas failed to do so with respect to each of the fixed price invoices in issue (Sam Decl. ¶¶ 3, 12, annexed as part of Group Ex. A to Pl.'s Prop. Findings).

15.   Although Seven Seas denies that it owes the sums stated in the fixed price invoices (Req. & Resp. Nos. 12, 36, 42, 48, 54, 60, 66, annexed as part of Group Ex. A to Pl.'s Prop. Findings), it admits that it received and accepted the produce identified there (Req. & Resp. Nos. 10, 34, 40, 46, 52, 58, 64, annexed as part of Group Ex. A to Pl.'s Prop. Findings).

16.   Defendants have not identified any evidence contradicting Dayoub's claim that the parties agreed that payment was due ten days after Seven Seas accepted the produce (see Proposed Finding By Defendants Regarding Damages, filed Mar. 13, 2006 (Docket Item 47) ("Defs.' Proposed Findings"); Tan Decl.; Defendants' Post-Inquest Brief ("Defs.' Br.")).

17.   Thus, Seven Seas owed Dayoub a total of $13,805.00 for the green cabbage indentified in the fixed price invoices.

D.   Allegedly Uncredited Payments by Seven Seas

18.   Seven Seas claims that it paid Dayoub $6,324.00 towards the invoices in issue for which Dayoub never gave it credit (Defs.' Proposed Findings ¶ 4; Tan Decl. ¶¶ 14-16).   Of

this amount, plaintiff essentially concedes that it has not given Seven Seas credit for a payment of $324.00 towards the amount owed on invoice OM 02565-01 (Mar. 23, 2001), and that the amount owed on that invoice should be reduced $324.00 from $7,280.00 to $6,956.00 (Plaintiff's Post-Inquest Hearing Brief ("Pl.'s Br.") 2).

19.   The remaining $6,000.00 that Seven Seas claims is uncredited is comprised of two $3,000.00 checks (Tan Decl. ¶ 16). Dayoub admits that it received the two checks in question (Pl.'s Br. 8).  Dayoub credited $5,200.00 of the checks towards the complete payment of three outstanding invoices that are not in issue in this case, as recorded in its cash receipts journal (Old Dayoub Cash Receipts Journal for the Period from March 1, 2000 to March 15, 2004, entered into evidence at the evidentiary hearing as Plaintiff's Exhibit ("Pl.'s Hr'g Ex.") 4).  Dayoub's handwritten notes on invoice 2001-0118-01 (Apr. 16, 2001) (the "April 16 Invoice"), also confirm that Dayoub credited $5,200.00 of the $6,000.00 from the checks in question towards the three outstanding invoices (Invoice annexed as an Undesignated Exhibit to Sam Decl., annexed, in turn, as part of Group Ex. A to Pl.'s Prop. Findings).

20.   The handwritten notes on the April 16 Invoice also show that the remaining $800.00 from the two checks in question was credited towards the $2,600.00 balance that Seven Seas

initially owed on the April 16 Invoice, reducing the balance on that invoice to $1,800.00 (Invoice annexed as Undesignated Exhibit to Sam Decl., annexed, in turn, as part of Group Ex. A to Pl.'s Prop. Findings).

21.   Seven Seas has not offered any additional evidence or argument challenging Dayoub's allocation of the two $3,000.00 checks.  Thus, I find that Seven Seas' payments to Dayoub have been fully credited to Seven Seas' account.

E.   <u>Open Market Purchases in Issue</u>

22.   There are also three open market purchases of cabbage in issue in this case (the "Open Market Invoices"):

| Date Produce Received | Invoice Number | Invoice Date |
|---|---|---|
| March 2, 2001 | OM 02565-01 | March 23, 2001 |
| March 15, 2001 | OM 02613-1 | March 28, 2001 |
| March 17, 2001 | OM[1] 02768-1 | March 21, 2001 |

(Tan Decl. Exs. A, C, F, I).

23.   Dayoub issued these invoices for five lots of excess green cabbage and/or napa cabbage that it shipped to Seven Seas on the dates listed above.  Dayoub had not been able to sell these five lots to buyers at a fixed price, either because the

---

[1]When Dayoub first sent the invoice dated March 21, 2001, to Seven Seas, the invoice number was listed as "02768-1" (Invoice No. OM 02768-1, dated Mar. 21, 2001, Pl.'s Hr'g Ex. 1 at 1). However, Dayoub subsequently changed the invoice number in its records to add the letters "OM," which stand for "open market" (Tr. 11).

buyers did not have room for them or because they were of poor quality (Tr. 30, 68).

24. Dayoub requested that Seven Seas accept these five lots on a consignment basis; i.e., rather than pay a fixed price, Seven Seas would sell the produce for the best price it could get and then remit the sale price, less "charges," to Dayoub (Tr. 30).

25. Sam testified that the date written as the "invoice date" on each of the invoices in question does not necessarily represent the date that the invoice was sent to or received by Seven Seas, nor does the invoice date necessarily represent the date on which the produce associated with the invoice was shipped or received (Tr. 27, 28).

26. Neither Dayoub nor Seven Seas has any record documenting when Dayoub sent the three Open Market Invoices or when Seven Seas received them. Sam testified that Dayoub sent invoices corresponding to each of these three shipments "within days," "not weeks" after Seven Seas received that shipment (Tr. 28).

27. Curiously, Dayoub sent Seven Seas two invoices for each of the open market shipments. On the first invoices that Dayoub sent regarding the three open market purchases, Dayoub typed the word "CONSIGNMENT" in the "Price" column (Invoice No. OM 02565-01, dated Mar. 23, 2001 ("First 2565 Invoice"), Tan

10

Decl. Ex. G at 1; Invoice No. OM 02613-1, dated Mar. 28, 2001
("First 2613 Invoice"), Tan Decl. Ex. A at 1; Invoice No. OM
02768-1, dated Mar. 21, 2001 ("First 2768 Invoice"), Tan Decl.
Ex. D).

      28.   Other than the word "CONSIGNMENT," Dayoub used the
same invoice form for these open market sales that it used for
its fixed price sales.  The invoices for the open market ship-
ments included the PACA Trust Terms and the Additional Contract
Terms (First 2565 Invoice, Tan Decl. Ex. G at 1; First 2613
Invoice, Tan Decl. Ex. A at 1; First 2768 Invoice, Tan Decl. Ex.
D).

      1.   <u>Invoice OM 02565-01</u>

      29.   On February 28, 2001, Seven Seas ordered 330
cartons of Chinese napa cabbage and 362 cartons of Korean napa
cabbage from Dayoub (<u>see</u> Valley View Farm Purchasing and Receiv-
ing Record for Purchase Order No. 015225 ("P&R Record for 2565"),
Tan Decl. Ex. I; First 2565 Invoice, Tan Decl. Ex. G at 1).

      30.   On March 2, 2001, Seven Seas received from Dayoub
the 692 cartons of napa cabbage, and 36 boxes of green cabbage
(collectively, the "2565 Produce") (P&R Record for 2565, Tan
Decl. Ex. I).

      31.   At some point after this produce was delivered,
Dayoub sent to Seven Seas, and Seven Seas received, the First

2565 Invoice, which listed the 692 cartons of napa cabbage, but did not list the 36 boxes of green cabbage (First 2565 Invoice, Tan Decl. Ex. G at 1; Tr. 71).

32.   An individual working for Seven Seas wrote an unexplained price of "9--" per carton on the invoice next to the word "CONSIGNMENT" after the sales were completed, and wrote in "$6228--" as the "total due" (Tan Decl. ¶ 11).

33.   There is no evidence showing that Seven Seas ever sent Dayoub a copy of the First 2565 Invoice with the handwritten endorsement, "9--."  There is no other evidence of oral communications between Dayoub and Seven Seas concerning the $9.00-per-carton price.

34.   Sam explained that Dayoub's practice with respect to consignment sales was to require the consignee to provide Dayoub with an accounting for the sales of all of the produce consigned.  This accounting needed to show both the price at which the produce was actually resold, as well as a proposed charge for the consignee's services (Tr. 39).

35.   If Dayoub did not receive an accounting, its practice was to change the price term in its invoice from the word "CONSIGNMENT" to a market price at which it believed the produce was actually sold (Tr. 7, 12, 15).

36.   In accordance with this practice, Dayoub prepared a revised invoice to Seven Seas, also dated March 23, 2001, that

(1) deleted the word "CONSIGNMENT," (2) included the 36 boxes of green cabbage, (3) added a price per carton of $10.00 for the napa cabbage and (4) included a price per box of $10.00 for the green cabbage (Invoice No. OM 02565-01, dated Mar. 23, 2001 (the "Revised 2565 Invoice"), Tan Decl. Ex. G at 2).  As a result, the Revised 2565 Invoice listed the total price for the napa cabbage as $6,920.00, and the total price for the green cabbage as $360.00.

37.  Dayoub did not offer any evidence concerning the basis for its price of $10.00 per carton/box.

38.  Dayoub also failed to offer any evidence concerning why it did not allocate any sum for Seven Seas' services.

39.  Seven Seas received a copy of the Revised 2565 Invoice.  This is evident from the fact that the copies of the invoice submitted by both Dayoub and Seven Seas include Seven Seas' handwritten price alterations; Seven Seas crossed out the $10.00 price and wrote in "9" as the price per carton of Chinese and Korean napa cabbage and the price per box of green cabbage (Tan. Decl. Ex. G at 2).  At $9.00 per carton/box, the price of the napa cabbage is $6,228.00 and the price of the green cabbage is $324.00.

40.  On the Revised 2565 Invoice submitted to the Court, Seven Seas circled both the original $360.00 price and the

13

handwritten $324.00 price and wrote next to the latter amount, "Paid Ck#19025 4/15/01" (Tan Decl. Ex. G at 2).

      41.  On Seven Seas' P&R Record for the 2565 invoice, $9.00 is written in the price column for all three types of cabbage.  However, in the far righthand margin, the number 12 is written next to each of the rows corresponding to the shipments of napa cabbage, and the number 10 is written next to the row corresponding to the shipment of green cabbage.  The evidence does not explain what, if anything, these numbers reflect.

      42.  There was no testimony concerning the actual resale price of any of the 2565 Produce.

      43.  Seven Seas is not claiming that there was any defect in the quality of the 2565 Produce (Tr. 73).

### 2.  Invoice OM 02613-1

      44.  On March 15, 2001, Dayoub asked Seven Seas to attempt to sell 660 cartons of excess napa cabbage on consignment; Seven Seas had not ordered the cabbage (the "2613 Produce") (Tr. 30, 68; Straight Bill of Lading for Exempt Commodities No. 02613-02, dated Mar. 15, 2001, Defs.' Hr'g Ex. A at 2; see also Valley View Farm Purchasing and Receiving Record for Purchase Order No. 015510, Tan Decl. Ex. A. at 2; First 2613 Invoice, Tan Decl. Ex. A at 1).

45.   Seven Seas agreed to sell the 2613 Produce on
consignment, but, after receiving the cabbage, advised Dayoub
that some of the cabbage was of unsalable quality (Tr. 68-70).

46.   At Seven Seas' request, the local USDA Inspector
inspected the produce on March 16, 2001 (USDA Agricultural
Marketing Service Inspection Certificate T-409821-6, dated Mar.
16, 2001 ("2613 Inspection"), Tan Decl. Ex. C).   The inspection
disclosed an average of 19% quality defects, 11% discoloration
defects, and 2% soft rot defects per carton (2613 Inspection, Tan
Decl. Ex. C).   The inspection further stated, "Additionally[,]
many contents of all cartons have concealed seedstems ranging in
length from 4 to 10 inches" (Inspection of 2613, Tan Decl. Ex.
C).

47.   In light of the results of the inspection, Dayoub
now admits that it is not owed payment for 32%[2] of the 2613
Produce because that percentage of the produce was of unsalable
quality (Pl.'s Br. 7-8).

48.   On March 23, 2001, Seven Seas faxed Dayoub a
letter dated March 22, 2001, claiming that, of the 660 cartons of
napa cabbage delivered on March 15, it was only able to sell 330
cartons (the "March 22 Letter") (Defs.' Hr'g Ex. A at 1).   Seven
Seas proposed to pay Dayoub $4.00 per carton for the cartons it

---

[2]It appears that Dayoub derived the 32% by combining the
percentages of cabbage found to have quality defects, to be
discolored and to have soft rot.

15

had sold (Defs.' Hr'g Ex. A at 1).  Seven Seas also stated that
"due to such poor qualities" in the cabbage, which arrived
"decay[ed, with] roots and with flower[s]," it had dumped 213
cartons, and returned 117 cartons to Dayoub on March 21, 2001
(Defs.' Hr'g Ex. A at 1).  Seven Seas further claimed that it was
entitled to subtract a $106.00 inspection fee from the amount due
to Dayoub (Defs.' Hr'g Ex. A at 1).  The March 22 Letter con-
cluded, "We will only remit $1,214.00 for this shipment and if
you have no questions and agreed on this, please sign below and
re-fax it to us" (Defs.' Hr'g Ex. A at 1).  Sam testified that
Dayoub may have received this fax (Tr. 33).

        49.  At some point after the 2613 Produce was shipped,
Dayoub sent to Seven Seas a copy of the First 2613 Invoice (Tan
Decl. Ex. A at 1; Tr. 71).  Although the First 2631 Invoice was
dated March 28, 2001, the parties do not know whether it was sent
before or after Seven Seas' March 22 Letter (see Tr. 27, 28).

        50.  The First 2613 Invoice included the handwritten
note, "Please apprise us of sale/return price as soon as possi-
ble" (Tan Decl. Ex. A at 1).

        51.  At some point after the First 2613 Invoice was
sent to Seven Seas, Dayoub prepared a revised invoice which
substituted the price of $10.00 per carton for the word "CONSIGN-
MENT" (Invoice No. OM 02613-1, dated Mar. 28, 2001 ("Revised 2613
Invoice"), annexed as an Undesignated Exhibit to Sam Decl.,

16

annexed, in turn, as part of Group Ex. A to Pl.'s Prop. Find-
ings).  Dayoub has offered no evidence that it ever sent the
Revised 2613 Invoice to Seven Seas (Tr. 43), and Tan testified
that the first time he saw the Revised 2613 Invoice was as part
of this action (Tr. 71).

        52.  There is no evidence concerning when the 2613
Produce was resold, other than the fact that the sale of the
produce was apparently complete by the time the March 22 Letter
was sent on March 23, 2001.  There is no evidence, other than the
March 22 Letter, concerning the price at which the 2613 Produce
was resold.  Nor is there any evidence in the record concerning
the basis, if any, for Dayoub's claim that the 2613 Produce
should be priced at $10.00 per carton.

        3.  <u>Invoice OM 02768-1</u>

        53.  On or about March 17, 2001, Dayoub asked Seven
Seas to resell on consignment 770 more cartons of excess napa
cabbage (the "2768 Produce"), and Seven Seas agreed (<u>see</u> Tr. 68);
Straight Bill of Lading for Exempt Commodities No. 02768-01,
dated Mar. 17, 2001, Tan Decl. Ex. F at 2; Valley View Farm
Purchasing & Receiving Record for Purchase Order No. 015520, Tan
Decl. Ex. F at 1).

        54.  On March 23, 2001, Seven Seas faxed a letter to
Dayoub dated March 21, 2001 (the "March 21 Letter") (Defs.' Hr'g

Ex. B).  The March 21 Letter stated, "Shipment 2768 arrived on
March 17th[,] but we ha[d] to dump almost half of it.  This [wa]s
due to poor qualities and the rest c[ould] []only be sold [at] a
very low price" (Defs.' Hr'g Ex. B).  The March 21 Letter also
claimed that Seven Seas had received only 768 (not 770) cartons
of napa cabbage on March 17, and it was only able to sell 453
cartons.  Seven Seas proposed to pay $3.00 per carton for the
cartons it was able to sell (Defs.' Hr'g Ex. B).  Seven Seas also
claimed in the March 21 Letter that it had to dump the remaining
315 cartons of napa cabbage.

     55.  At some point in March after the 2768 Produce was
shipped, Dayoub sent to Seven Seas a copy of invoice OM 02768-1
(First 2768 Invoice, Tan Decl. Ex. D; Tr. 71).  Although the
invoice was dated March 21, 2001, the parties do not know whether
it was sent before or after Seven Seas' March 21 Letter (see Tr.
27, 28).  The First 2768 Invoice included the word "CONSIGNMENT"
in the "Price" column.

     56.  At some point after it sent the First 2768 Invoice
to Seven Seas, Dayoub prepared a revised invoice which substi-
tuted the price of $8.50 per carton for the word "CONSIGNMENT"
(Invoice No. OM 02613-1, dated Mar. 28, 2001 ("Revised 2613
Invoice"), annexed as Undesignated Exhibit to Sam Decl., annexed,
in turn, as part of Group Ex. A to Pl.'s Prop. Findings).  Dayoub
offered no evidence that it ever sent the Revised 2768 Invoice to

Seven Seas (Tr. 43), and Tan testified that the first time he saw
the Revised 2768 Invoice was in plaintiff's document production
in this action (Tr. 71).

57.   There is no evidence concerning the date(s) on
which Seven Seas sold the 2768 Produce, other than the fact that
Seven Seas had sold the produce by the time it sent the March 21
Letter.   There is no evidence, other than the March 21 Letter,
concerning the price at which the 2768 Produce was resold.   Nor
is there any evidence concerning the basis for Dayoub's conten-
tion that the 2768 Produce should be valued at $8.50 per carton.

F.   Dayoub's Efforts to Collect

58.   Dayoub repeatedly requested that Seven Seas remit
payments for all of the outstanding invoices, including the open
market invoices (Tr. 44-45, 60).   However, there is no evidence
that Dayoub ever requested, orally or in writing, that Seven Seas
pay it the specific amounts set forth in the revised open market
invoices.

59.   On August 8, 2001, Dayoub sent a fax to Seven Seas
requesting payment on all unpaid invoices.   The fax did not
specify the amounts due on the three open market invoices.
Instead, for those invoices, it listed the amounts due as one
cent or two cents (Defs.' Hr'g Ex. K).   Sam testified that these
one cent and two cent amounts were accounting placeholders that

19

signified that Dayoub did not know actual open market prices (Tr. 43, 59-60).

60.   Dayoub offered no evidence concerning negotiations over the amount of Seven Seas' commission.  Neither party discussed whether there was any customary or agreed to commission rate.  Nor did either party question Tan concerning the actual price at which the cabbage in the open market invoices was resold.

G.   Dayoub's Costs and Attorneys' Fees

61.   Dayoub retained Illinois counsel in connection with this matter, which has submitted contemporaneous time records documenting 120.4 hours of attorney work time billed to the Dayoub.  (Keaton & Associates, P.C., Detailed Billing Statements for Dayoub Marketing, dated Apr. 13, 2004 through Jan. 12, 2006 ("K&A Billing"), annexed as Group Ex. 1 to the Declaration of Nancy J. Cox, dated Feb. 10, 2006 ("Cox Decl."), which is part of Group Ex. C to Pl.'s Prop. Findings).

62.   There is no evidence concerning the names, positions, or experience of any of the attorneys at Illinois counsel who worked on the matter.

63.   Dayoub's Illinois counsel retained local counsel in connection with this matter.  Although the K&A Billing includes periodic statements of charges billed to Dayoub by local

counsel, none of local counsel's contemporaneous time records or the identities of its attorneys have been submitted.  Nor is there an affidavit from local counsel stating that the summaries are accurate and are based on contemporaneous records.

64.  In addition to the foregoing legal fees, Dayoub has also incurred filing fees totaling $150.00 (Docket Item 1).

III.  Conclusions of Law

65.  This action arises under 7 U.S.C. § 409e (2000).  The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 7 U.S.C. §§ 499e(b) & 499e(c)(5), and has supplemental jurisdiction over the state law contract claim under 28 U.S.C. § 1367.  Venue is properly established in the Southern District of New York pursuant to 28 U.S.C. § 1391(b).  The Court has personal jurisdiction over the parties.

66.  At all times relevant to this action through at least May 12, 2001, Seven Seas was a "dealer" of produce, as defined by 7 U.S.C. § 499a(b)(6), and licensed as such by the USDA.

67.  With respect to the open market invoices, Seven Seas was also acting as a "commission merchant," as defined by PACA, because it received all of the produce in question for sale on Dayoub's behalf.  7 U.S.C. § 499a(b)(5) ("The term 'commission merchant' means any person engaged in the business of receiving

in interstate commerce . . . any perishable agriculltural commod-
ity for sale, on commission, or for or on behalf of another.").

68.  All of the cabbage in issue here was a "perishable
agricultural commodity" within the meaning of PACA, because the
cabbage in issue was a fresh vegetable.  7 U.S.C. § 499a(b)(4)
("The term 'perishable agricultural commodity' [m]eans any of the
following whether or not frozen or packed in ice:  Fresh fruits
and fresh vegetables of every kind and character.").

69.  PACA entitles an injured party to seek "the full
amount of damages . . . sustained in consequence" of any viola-
tion of section 499b of PACA.  7 U.S.C. § 499e(a).

70.  Under section 499b, it is unlawful for any li-
censed produce dealer or commission merchant "to fail or refuse
truly and correctly to account and make full payment promptly in
respect of any transaction" in which a perishable agricultural
commodity is contracted to be bought in interstate commerce, and
is liable to the party injured by its failure to pay.  7 U.S.C.
§ 499b(4).

A.  Damages for Fixed Price Invoices

71.  Dayoub has proven that it sustained damages of
$13,805.00 in consequence of defendants' breach of the fixed
price contracts discussed in Part II.C, supra.  This amount
represents the price of the goods accepted, less the payment

22

already made by Seven Seas, which is the appropriate measure of damages here.  N.Y. U.C.C. § 2-709(1)(a) ("When the buyer fails to pay the price as it becomes due, the seller may recover . . . the price [] of goods accepted . . . .").[3]

72.  Defendants have not disputed that the fixed price invoices represented agreements by Seven Seas to purchase the produce described in the invoices from Dayoub at the prices stated.  Defendants have not identified any evidence contradicting Dayoub's claim that, under the agreements, Seven Seas' payments to Dayoub on invoices were due ten days after Seven Seas accepted the produce.  Defendants have not disputed that Seven Seas received and accepted the produce stated in those invoices. Defendants have made no payment to Dayoub towards any of the amounts due in connection with the fixed price invoices, other than the $800.00 credited towards Invoice 2001-0118-01.

B.  Damages for Open Market Invoices

73.  As a commission merchant, Seven Seas was required to account for the open market sales that it made on Dayoub's

---

[3]The Uniform Commercial Code ("UCC") applies to sales of produce under PACA, "where PACA is silent as to a material part of the transaction at issue."  Tray-Wrap, Inc. v. Meyer, 90 Civ. 7688 (DLC), 1994 WL 710804 at *4 (S.D.N.Y. Dec. 20, 1994) (Cote, J.), aff'd mem., 71 F.3d 404 (2d Cir. 1995).  "Given the strong contacts here with New York, and the parties' reliance on New York law," I shall apply the UCC as adopted by New York. Tray-Wrap, Inc. v. Meyer, supra, 1994 WL 710804 at *4 n.5.

behalf by "rendering a true and correct statement showing the date of receipt [of each shipment of cabbage] and date of final sale [of the cabbage received], the quantities sold at each price, or other disposition of the produce, and the proper, usual or specifically agreed upon selling charges and expenses properly incurred or agreed to in the handling thereof, plus any other information required by [7 U.S.C.] § 46.29."  7 C.F.R. § 46.2(y)(1) (defining "truly and correctly to account," as used in 7 U.S.C. § 499b(4)); see also 7 C.F.R. § 46.29 ("[I]t is a violation of section [499b] of [PACA] to fail to render true and correct accountings in connection with consignments . . . ."). The commission merchant's "own records must also contain specific information regarding goods returned or rejected by a buyer, goods dumped as commercially worthless, and regarding other allowable expenses."  Harry Klein Produce Corp. v. U.S. Dep't of Agric., 831 F.2d 403, 405-06 (2d Cir. 1987) (directing enforcement of Order of Sec'y of Agriculture revoking license of produce dealer that failed to comply with accounting requirements on consignment sales), citing 7 C.F.R. §§ 46.21-.22, 46.29.

        74.   Nothwithstanding any noncompliance with these recordkeeping requirements by Seven Seas, Dayoub has the burden to prove, at the very least, a reasonable basis for estimating damages.  "The law tilts somewhat generously in favor of wronged plaintiffs by casting upon them only a burden to prove the fact

that the wrong caused damages and a reasonable basis for estimat-
ing the damages alleged to have been suffered; the risk of error
in calculation is thereby placed on the wrongdoer." <u>Diduck v.
Kaszycki & Sons Contractors, Inc.</u>, 974 F.2d 270, 289-90 (2d Cir.
1992) (Newman, J., concurring in part and dissenting in part),
<u>citing</u> <u>Bigelow v. RKO Radio Pictures, Inc.</u>, 327 U.S. 251, 263-66
(1946) <u>and</u> <u>Story Parchment Co. v. Paterson Parchment Paper Co.</u>,
282 U.S. 555, 562-67 (1931); <u>see also</u> <u>Contemporary Mission, Inc.
v. Famous Music Corp.</u>, 557 F.2d 918, 926-27 (2d Cir. 1977) ("The
plaintiff need only show a 'stable foundation for a reasonable
estimate of royalties he would have earned had defendant not
breached.'"), <u>quoting</u> <u>Freund v. Wash. Square Press, Inc.</u>, 34
N.Y.2d 379, 383, 314 N.E.2d 419, 421, 357 N.Y.S.2d 857, 861
(1974).

75.  Of the three open market invoices, plaintiff has
only provided a reasonable basis for estimating damages in
connection with the 2565 Produce.

### 1.  <u>The 2565 Produce</u>

76.  There was no evidence offered concerning the
actual price at which Seven Seas sold the 2565 Produce, or what
charges Seven Seas subtracted from the sale price as a fee for

its services.[4]  However, plaintiff did offer in evidence three
USDA reports of the wholesale market prices for cabbage in New
York City on March 21, 23 and 28, 2001.  These reports demon-
strate that the prices of 1-7/8 bushel cartons of napa cabbage on
these dates ranged from $14.00 to $16.00, and the prices for 50-
pound cartons of green cabbage ranged from $7.00 to $10.00.  Sam
testified that these market reports provided prices for produce
in "excellent condition" (Tr. 29).  Seven Seas' witness, Tan,
admitted that there were no quality problems with the 2565
Produce, and that the only dispute was regarding whether Seven
Seas owed Dayoub $9.00 per carton or $10.00 per carton of cabbage
(Tr. 73).

          77.  The price of cabbage fluctuates from day to day;
the fluctuations are sometimes dramatic (Tr. 29).  Dayoub did not
establish the precise day(s) on which Seven Seas sold the 2565
Produce.  However, since Seven Seas did not offer any evidence to
show the actual price at which it sold the 2565 Produce, in
violation of the accounting requirements of PACA, defendants must
bear the risk of the error in estimating Dayoub's damages.

          78.  Dayoub's requested price of $10.00 per carton for
the napa cabbage sold under the 2565 Invoice is a reasonable

---

          [4]It is possible that the numbers "12," "12," and "10" that
are handwritten in the righthand margin of Seven Seas' P&R Record
for 2565 represent the actual sale prices of the cabbage.
However, Dayoub apparently did not notice these notations, and,
as a result, it never asked Seven Seas to explain their meaning.

measure of damages because it is below the market price for a comparable unit of cabbage during the relevant time period. Sam testified that Dayoub shipped and sold the napa cabbage discussed in the First 2565 Invoice from Florida in 1-5/8 (or 13/8) bushel cartons (Tr. 13). As noted above, between March 21, 2001, and March 28, 2001, the price of a 1-7/8 bushel carton of napa cabbage ranged from $14.00 to $16.00 (Pl.'s Hr'g Ex. 5 at 3; Pl.'s Hr'g Ex. 6 at 3; Pl.'s Hr'g Ex. 7 at 3). Multiplying the lowest price reported for 1-7/8 bushels, $14.00, by 13/15 (the ratio of 1-5/8 to 1-7/8) yields a product of $12.13 as the lowest market price that a 1-5/8 bushel carton of Florida napa cabbage could command between March 21 and 28, 2001. Thus, given market conditions at the relevant time, $6,920.00 ($10.00 per carton of napa cabbage multiplied by 692 cartons accepted by Seven Seas) is a reasonable and appropriate measure for its damages for the napa cabbage sold under the 2565 Invoice.

79. Regarding the 36 cartons of green cabbage in the 2565 Invoice, however, the market reports from New York City reveal considerably lower prices. The price of 50-pound cartons of Florida green cabbage sold at the wholesale markets ranged from $7.00 to $10.00 between March 21 and 28, 2001 (Pl.'s Hr'g Ex. 5 at 3; Pl.'s Hr'g Ex. 6 at 3; Pl.'s Hr'g Ex. 7 at 3). Plaintiff has not submitted any evidence or explanation for why it is seeking $10.00 per carton of green cabbage, when the market

27

reports that it submitted suggest that the $9.00-per-carton price suggested by Seven Seas is closer to the average price at market. Since the evidence that Dayoub itself submitted indicates that the $9.00 suggested by Seven Seas is the more reasonable price, and Dayoub has not presented any arguments to the contrary, that price is the proper measure of damages for the green cabbage in the 2565 Invoice.  Because Dayoub has admitted that Seven Seas has a positive balance of $324.00 ($9.00 multiplied by 36 cartons delivered), that sum should be credited to Seven Seas on the First 2565 Invoice, and Dayoub's damages on the green cabbage and Seven Seas' credit cancel each other out.

### 2.   The 2613 and 2768 Produce

80.   There is no stable basis on which to estimate the sale price of the two remaining open market invoices.  As a consequence, there is no way to ascertain the damages sustained by Dayoub other than by resorting to the sale prices defendants admit.

81.   Neither the 2613 Produce nor the 2768 Produce appears to have been of market quality.  Tan testified that Dayoub asked him to take the produce on consignment because "the truck driver ha[d] been driving around the load from one ware-house to another warehouse.  Everybody d[id]n't want it because of the bad product" (Tr. 68).  Sam did not confirm or deny that

28

the 2613 and 2768 produce was of sub-standard quality, but
testified that she couldn't recall whether Dayoub had attempted
to sell that produce to other buyers prior to Seven Seas and
could not controvert Tan's testimony (Tr. 24).  Sam did testify
that a possible reason to sell produce on consignment other than
poor quality is that the produce is excess and that "a customer
may not want to take it because they are sort of overloaded," but
she was not asked whether that situation occurred with the
produce in issue (Tr. 30).  Overall, the testimony suggests that
on March 15 and 17, 2001, Dayoub was having trouble selling these
particular shipments of napa cabbage.  Thus, even if the cabbage
was in good condition, there was some other factor that made it
less salable than the produce that Dayoub was able to sell for
fixed prices on those days.  As a result, the prices for napa
cabbage quoted in the market reports for the days in question
overestimate the resale value of this particular produce.

          82.   Seven Seas documented the sub-standard quality of
the 2613 Produce by obtaining an inspection.  The inspection
found an average of 19% quality defects, 11% discoloration
defects, and 2% rot in the cabbage (Inspection of 2613, Tan Decl.
Ex. C).  Dayoub admits that the inspection showed that approxi-
mately 32% of the 2613 Produce was unsalable; and concedes that
it is not entitled to any compensation for 32% of the 2613
Produce (Pl.'s Br. 7).

83.   Defendants essentially admit that Dayoub sustained damages of $4.00 per carton of salable napa cabbage accepted on March 15, 2001, and $3.00 per carton of salable napa cabbage accepted on March 17, 2001 (see Tan Decl. ¶¶ 7, 10).  Seven Seas proposed that it pay Dayoub at those prices in its March 21 Letter and March 22 Letter, both faxed to Seven Seas on March 23, 2001 (Defs.' Hr'g Ex. A at 1; Defs.' Hr'g Ex. B).  Dayoub has not produced any evidence that either indicates these prices are unreasonable or contradicts Seven Seas' evidence that the 2613 and 2768 Produce was of substantially inferior quality.  Dayoub has not explained how the Court should account for this lesser quality in its estimate of damages, and it has not proposed any other reasonable method of estimation.  Dayoub also has not controverted Seven Seas' claim that it should be credited $106.00 that Seven Seas spent obtaining a USDA inspection of the 2613 Produce (Defs.' Hr'g Ex. A at 1).  Therefore, I have no basis on which to award Dayoub damages other than $4.00 per carton for the cabbage accepted on March 15, 2001, less 32% (for which Dayoub no longer demands payment) and less the $106.00 cost of inspection, and $3.00 per carton for the cabbage accepted on March 17, 2001.

84.   There are several unresolved issues concerning the number of cartons for which Dayoub must be paid.  Seven Seas' March 22 Letter suggested that it was not required to pay for 213 cartons of the 2613 Produce that had to be dumped, due to the

defects documented in the inspection.  Since 32% of the 660 total
cartons that make up the 2613 Produce is approximately 211, not
213, defendant need not make any payment for those 211 cartons of
the 2613 Produce.

        85.  Seven Seas' March 22 Letter suggested, and Seven
Seas now claims, that Seven Seas was not required to remit
payment in connection with an additional 117 cartons of the
cabbage that Seven Seas had returned to Dayoub on March 21, 2001.
However, Dayoub correctly points out that PACA requires returns
or rejections of produce to be made within a "reasonable time,"
which has been interpreted to mean within 24 hours of the buyer's
initial receipt (Pl.'s Br. 7 n.9; 7 C.F.R. §§ 46.2(bb), (cc)(2)).
Seven Seas has not responded to this argument.  As a result,
Seven Seas is obligated to pay for the 117 cartons of produce in
the 2613 shipment that it received, but returned six days later.
Therefore, Seven Seas owed Dayoub payment for 449 (660 - 211)
cartons of the 2613 Produce at $4.00 per carton, or $1,796.00.

        86.  With respect to the 2768 Produce, Seven Seas
argues that it is not required to pay for 315 out of the 770[5]
cartons of cabbage that it accepted because it had to dump that

---

    [5]Seven Seas' March 21 Letter implies that it received only
698 boxes of the 2768 Produce (Defs.' Hr'g Ex. B), but the Bill
of Lading for the 2768 Invoice establishes that 770 boxes were
received (Straight Bill of Lading for Exempt Commodities No.
02768-01, dated Mar. 17, 2001, Tan Decl. Ex. F at 2).  Defendants
have not offered any reason to disbelieve that figure.

produce "due to poor qualities" (Defs.' Hr'g Ex. B; Tan Decl.
¶ 10).  As already discussed, PACA imposes intentionally strin-
gent requirements on consignment sellers like Seven Seas to
account for the disposition of every lot of produce that they
receive, including any produce that they claim had no value and
had to be dumped.  Seven Seas admits that it has no documentation
of the fact that it dumped, rather than sold, the 315 cartons of
produce in issue, in violation of the requirements of PACA.  As a
result, Seven Seas is liable to Dayoub for all 770 boxes that it
accepted on consignment in connection with the First 2768 Invoice
in the amount of $3.00 per carton, resulting in damages totaling
$2,310.00.

   C. <u>Interest on Amounts Due</u>

     87.  Seven Seas concedes that it received the invoices
from Dayoub confirming the terms of the agreements that formed
the basis of all of the damages in issue here, and that each
invoice stated that "[i]nterest shall accrue on any past due
balance at the rate of 1.5% per month (18% per annum)" (Tan Decl.
¶¶ 5, 8, 11, Exs. A, D, G; Req. & Resp. Nos. 9, 21, 33, 39, 45,
51, 57, 63, annexed as part of Group Ex. A to Pl.'s Prop. Find-
ings; Invoices annexed as undesignated exhibits to Sam Decl.,

annexed as part of Group Ex. A to Pl.'s Prop. Findings).[6]  Dayoub
claims that, as a result of this clause on its invoices, it is
entitled to pre-judgment interest "on the outstanding amount[s]
due" (Pl.'s Br. 8).  Defendants respond that "the UCC has never
been held by this Circuit to permit interest above the statutory
rate in a PACA case" (Defs.' Br. 8).  Although defendants'
statement is literally true, it is also true that the Second
Circuit has never held that the UCC precludes interest above the
statutory rate in a PACA case.  There is simply no authority from
the Court of Appeals addressing the issue.  However, several
district court decisions that reviewed interest clauses in PACA
invoices similar, or even identical, to the one involved here
have enforced them.  E.g., Dayoub Mktg., Inc. v. S.K. Produce
Corp., 04 Civ. 3125 (WHP), 2005 WL 3006032 at *4 (S.D.N.Y. Nov.
9, 2005); see also John Geogallas Banana Distribs. of N.Y., Inc.
v. N & S Tropical Produce, Inc., 07-CV-5093 (ST)(RER), 2008 WL
2788410 at *5 (E.D.N.Y. July 15, 2008); Top Banana, L.L.C. v.

_____

[6]Defendants argue that Seven Seas did not receive the
invoices submitted to the Court in connection with the
consignment sales that gave the impression that the transactions
were fixed price sales, and that the Court should not, therefore,
enforce the terms on those invoices (Defs.' Br. 11).  Defendants
are correct that the terms of those invoices should not be
enforced because there is no evidence defendants received them.
However, defendants admit that they did receive the original
versions of those invoices which stated "CONSIGNMENT" instead of
a price term (Tan Decl. ¶¶ 5, 8, 11).  Those original invoices
included the same interest and attorneys' fees clauses, and are
potentially enforceable against defendants.

Dom's Wholesale & Retail Center, Inc., 04 Civ. 2666 (GBD)(AJP),
2005 WL 1149774 at *2-*3 (S.D.N.Y. May 16, 2005), adopted by 2005
WL 1529736 at *5 (S.D.N.Y. June 28, 2005) aff'd sub nom.
Coosemans Specialties, Inc. v. Gargiulo, 485 F.3d 701, 703, 704-
05 (2d Cir. 2007) (affirming award of principal, interest and
attorneys' fees to plaintiffs under PACA, but not addressing
district judge's analysis of interest award because defendants
did not appeal that portion of judgment).

       88.  Section 2-207(2) of the UCC provides that, between
merchants, additional terms in a confirmatory invoice "become
part of the contract unless," inter alia, "they materially alter
it" or "notification of objection to them . . . is given within a
reasonable time after notice of them is received."  N.Y. U.C.C.
§ 2-207(2).  Seven Seas admits that it received the invoices that
form the basis of the damages in issue here.  All parties admit
that Dayoub and Seven Seas are merchants within the meaning of
the U.C.C.  Defendants do not argue that they objected to the
additional invoice terms (Defs.' Br. 11).  Nor do they argue that
the terms materially alter the prior agreement (Defs.' Br. 11).
Thus, defendants offer no legal authority to support their
argument that the clause should not be enforced.  As a result, I
find that defendants owe Dayoub pre-judgment interest at the rate
of 1-1/2% per month.

89.  With respect to the seven fixed price invoices, because no party has offered evidence concerning the date on which the produce associated with those invoices was accepted, the interest should be calculated beginnning 10 days from the date of each invoice.

90.  With respect to the three open market invoices, interest started to accrue ten days from the date of acceptance of the produce, i.e., on March 12, 2001 for the First 2565 Invoice, on March 25, 2001 for the First 2631 Invoice, and on March 27, 2001 for the First 2768 Invoice.

91.  Using these dates, I calculate the following amounts of interest owed on each of the invoices in issue here:

### Fixed Price Invoices

| Principal Due | Dates of Accrual | Interest Due (0.0493% per day) |
|---|---|---|
| $2,600.00 (#02840-03) | 3/30/01-10/31/08 (2,773 days) | $3,553.43 ($1.28180 per day) |
| $1,560.00 (#02926-01) | 4/8/01-10/31/08 (2,764 days) | $2,125.74 ($0.76908 per day) |
| $1,155.00 (#02955-03) | 4/10/01-10/31/08 (2,762 days) | $1,572.74 ($0.56942 per day) |
| $1,800.00 (#2001-0118-01) | 4/26/01-10/31/08 (2,746 days) | $2,436.80 ($0.88740 per day) |
| $2,040.00 (#2001-0195-03) | 5/7/01-10/31/08 (2,735 days) | $2,750.64 ($1.00572 per day) |
| $3,600.00 (#2001-0270-02) | 5/10/01-10/31/08 (2,732 days) | $4,848.75 ($1.77480 per day) |
| $1,050.00 (#2001-0278-02) | 5/12/01-10/31/08 (2,730 days) | $1,413.18 ($0.51765 per day) |

35

Open Market Invoices

| Principal Due | Dates of Accrual | Interest Due (0.0493% per day) |
|---|---|---|
| $6,920.00 (#OM 02565-01) | 3/12/01-10/31/08 (2,791 days) | $9,521.66 ($3.41156 per day) |
| $1,796.00 (#OM 02613-1) | 3/25/01-10/31/08 (2,778 days) | $2,459.72 ($0.88543 per day) |
| $2,310.00 (#OM 02768-1) | 3/27/01-10/31/08 (2,776 days) | $3,161.39 ($1.13883 per day) |

| Total Principal Due | Total Interest Due |
|---|---|
| $24,831.00 | $33,844.05 |

D.  Attorneys' Fees

92. Dayoub also claims that it is entitled to its
costs of collection, including attorneys fees.  It argues that,
since each of its confirmatory invoices stated that "[i]n the
event collection actions become necessary, buyer agrees to pay
seller's costs and expenses of collection, including attorneys'
fees, until account balances are paid in full," these terms were
incorporated into the contract under U.C.C. § 2-207(2) for the
same reason that Dayoub's interest terms were part of the perti-
nent contracts.  Seven Seas argues that Dayoub's attorney fees
are excessive.  Dayoub also argues that no attorney's fees should
be awarded as sanction for Dayoub's misleading the Court concern-
ing the nature of the open market sales (Defs.' Br. 10).

36

93.   The principal problem with defendants' sanction argument is that it lacks any legal basis.  If a party establishes a breach of contract, as Dayoub has done here, it is entitled to recover the damages permitted by law.  Where a contract permits the prevailing party in an action for breach to recover attorneys fees, such fees are ordinarily recoverable.  See Alland v. Consumers Credit Corp., 476 F.2d 951, 955-56 (2d Cir. 1973); Plant Planners, Inc. v. Pollock, 91 A.D.2d 1017, 1017-18, 457 N.Y.S.2d 890, 892 (2d Dep't 1983); see also N.Y. U.C.C. § 2-719(1) (parties free to contract "for remedies in addition to or in substitution for those provided" in the UCC).  If misconduct occurs in a litigation, a court has ample means to sanction that conduct in response to a properly briefed motion pursuant to Federal Rules of Civil Procedure 11 and 37, 28 U.S.C. § 1927 or the court's inherent power.  However, I am not aware of any principle of law that permits a federal court to disregard the procedures and quantum of proof required to impose sanctions under these provisions by simply denying a party a remedy to which it is otherwise entitled.  I decline defendants' invitation to create such a principle.

94.   Defendants also argue that the amount of fees Dayoub is seeking are "exorbitant and against public policy," which I interpret to mean that the defendants claim the fees are excessive (Defs.' Br. 10).  "The standard method for determining

37

the amount of reasonable attorenys' fees is 'the number of hours
reasonably expended on the litigation multiplied by a reasonable
hourly rate,' or a 'presumptively reasonable fee.'"  Argi Exotic
Trading, Inc. v. New Man Designed Sys., Ltd., 07-CV-0049
(NG)(MDG), 2008 WL 2397565 at *4 (E.D.N.Y. June 12, 2008), citing
Hensley v. Eckerhart, 461 U.S. 424, 433 (1983), Arbor Hill
Concerned Citizens Neighborhood Ass'n, 522 F.3d 182, 188-90 (2d
Cir. 2008) and Chambless v. Masters, Mates & Pilots Pension Plan,
885 F.2d 1053, 1058-59 (2d Cir. 1989).  "In reviewing a fee
application, the district court must examine the particular hours
expended by counsel with a view to the value of the work product
of the specific expenditures to client's case."  Argi Exotic
Trading, Inc. v. New Man Designed Sys., Ltd., supra, 2008 WL
2397565 at *4, citing Lunday v. City of Albany, 42 F.3d 131, 133
(2d. Cir. 1994) and DiFilippo v. Morizio, 759 F.2d 231, 235 (2d
Cir. 1985).  The court should exclude "excessive, redundant or
otherwise unnecessary hours, as well as hours dedicated to
severable unsuccessful claims."  Quarantino v. Tiffany & Co., 166
F.3d 422, 425 (2d Cir. 1999).  In this Circuit, any attorney "who
applies for court-ordered compensation . . . must document the
application with contemporaneous time records.  These records
should specify, for each attorney, the date, the hours expended,
and the nature of work done."  New York State Ass'n for Retarded
Children, Inc. v. Carey, 711 F.2d 1136, 1147-48 (2d Cir. 1983).

95.   Dayoub's Illinois counsel has submitted contempo-
raneous time records for themselves, but not for local counsel.
There is scant information in the record concerning the nature of
the legal work that local counsel performed, the attorneys who
performed the work, the dates of that work, and the hours ex-
pended (Cox Decl. Group Ex. 1, annexed as part of Group Ex. C to
Pl.'s Prop. Findings).   Therefore, in light of <u>Carey</u>, I deny that
portion of Dayoub's application that seeks fees for services
rendered by local counsel.

96.   Defendants oppose the portion of Dayoub's attor-
neys' fees that represents its efforts to obtain a preliminary
injunction on the ground that this work was duplicative of an
application for preliminary injunction made by other trust
creditors in a related action against the defendants (<u>see</u> Defs.'
Br. 10 ("[O]ver $4000 was billed in obtaining a preliminary
injunction against the [d]efendants at a time when a preliminary
injunction was already in existence and had been obtained by
other PACA trust creditors in a related action against the
[d]efendants.")).   Seven Seas cites no factual authority to
support this assertion.   A review of the docket in this case and
in the related case of <u>Freitas Bros. v. Seven Seas Trading Co.,
Inc.</u>, 02 Civ. 8278, reveals <u>no</u> earlier preliminary injunction
against defendants.   The attorneys' fees detail submitted by
Dayoub reveals that a portion of the fees was spent on moving for

39

a Temporary Restraining Order (Cox Decl. Group Ex. 1, annexed as
part of Group Ex. C to Pl.'s Prop. Findings).  There is no
allegation that this motion was frivolous, nor any explanation of
why a preliminary injunction obtained to protect Dayoub's rights
would be duplicative of a preliminary injunction obtained to
protect an unrelated party's rights.  Therefore, I do not find
defendants' argument concerning the attorneys' fees attributable
to the the preliminary injunction motion to be persuasive.

        97.  The primary redundancy in Dayoub's fee application
is that a large portion of its Illinois counsel's time is attrib-
utable to conferring and strategizing with local counsel.  If I
were to award Dayoub its local counsel's fees, this might require
a subtraction of a percentage of the time spent that appears to
be redundant.  However, since I am not awarding any fees to local
counsel, there is no risk of a redundant fee award.

        98.  Dayoub has not submitted evidence demonstrating
that the hourly rate sought by its attorneys is reasonable.
Although Dayoub's fee application stated the rates at which
Illinois counsel billed for time, it did not identify the spe-
cific attorneys who provided the services or describe the back-
ground and experience of those attorneys.  For example, some
attorneys' time is billed at $275.00 per hour, others at $215.00
per hour, and later, $280.00 per hour and $235.00 per hour, but
neither the names of the attorneys nor their background are set

40

forth.  Dayoub's Illinois counsel's only explanation for its fees
is that "Keaton & Associates have expended a total of 125.3
hours, at rates ranging from $70.00 per hour for paralegal time
to $280.00 per hour for partner time."

99.  Furthermore, Dayoub's Illinois counsel's rates are
higher than those of plaintiffs' attorneys in PACA cases in this
district and in the Eastern District of New York.  See, e.g.,
Argi Exotic Trading, Inc. v. New Man Designed Sys., Ltd., supra,
2008 WL 2397565 at *4 (awarding attorneys' fees to plaintiff at
rate of $175.00 per hour, less 10%, in PACA case); Palmareal
Produce Corp. v. Direct Produce #1, Inc., 07-CV-1364 (SLT)(RLM),
2008 WL 905041 at *4 (E.D.N.Y. Mar. 31, 2008) (awarding average
fees of $157.00 per hour for local counsel as well as $226.00 per
hour for counsel of record, and explaining that overall attor-
neys' fees awards in Eastern District, not specific to PACA
cases, have been approved at rates of $200.00 to $300.00 for
partners, $100.00 to $150.00 for junior associates, and $200.00
to $250.00 for senior associates); Frankie Boy Produce Corp. v.
Sun Pacific Enters., 99 Civ. 10158 (DLC), 2000 WL 1532914 at *2
(S.D.N.Y. Oct. 17, 2000) (approving hourly rates of $195.00 for
local counsel and $150.00 for principal counsel's associates).

100.  Since Dayoub's counsel has not specified whether
its various billing rates apply to partners or associates, there
is no evidentiary basis on which I can assess the reasonableness

41

of the rates.  There is also no evidence concerning the reason-
ableness of plaintiff's counsel's fees within the context of PACA
cases in this District.  Since a judge within this District found
$150.00 to be a reasonable rate for counsel in a PACA case in
2000, Frankie Boy Produce Corp. v. Sun Pacific Enters., supra,
2000 WL 1532914 at *2, I will adjust that rate to $175.00 per
hour, as a result of inflation, and apply it to all of the time
that plaintiff's Illinois counsel billed to to this matter.
Moreover, I calculate, based on Dayoub's counsel's billing
statements, a total of 123.8 hours that Illinois counsel actually
billed to Dayoub, not 125.3 hours, because there were 1.5 hours
on September 26, 2005, that appeared on Dayoub's billing state-
ment, but for which Dayoub was not charged (Cox Decl. Group Ex.
1, annexed as part of Group Ex. C to Pl.'s Prop. Findings).  As a
result, Dayoub's should be awarded $21,665.00 ($175.00/hour x
123.8 hours) in attorneys' fees.  Further, Dayoub's Illinois
counsel documented a total of $768.67 in reasonable additional
costs such as telephone, mail, and fax costs in connection with
this matter for which Dayoub reimbursed it, and which it is
entitled to recover here.

        101.  Therefore, I calculate Dayoub's total damages as
follows:

        $24,831.00 -- Principal Owed on All Invoices
        $33,844.05 -- Interest Owed on All Invoices
        $21,665.00 -- Reasonable Attorneys' Fees paid by Dayoub
        $   768.67 -- Reasonable Attorneys' Costs paid by Dayoub

                              42

```
$    150.00 -- Filing Fee paid by Dayoub
-$    106.00 -- Produce Inspection Fee paid by Seven Seas

$81,152.72 -- Total
```

## IV.  Conclusion

Accordingly, for all the foregoing reasons, I respect-
fully recommend that plaintiff be awarded $81,152.72 in damages,
interest, reasonable costs and fees, including attorneys' fees.

## V.  Objections

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of
the Federal Rules of Civil Procedure, the parties shall have ten
(10) days from receipt of this Report to file written objections.
See also Fed. R. Civ. P. 6(a) and 6(e).  Such objections (and
responses thereto) shall be filed with the Clerk of the Court,
with courtesy copies delivered to the Chambers of the Honorable
George B. Daniels, United States District Judge, 500 Pearl
Street, Room 630, and to the Chambers of the undersigned, 500
Pearl Street, Room 750, New York, New York 10007.  Any requests
for an extension of time for filing objections must be directed
to Judge Rakoff.  FAILURE TO OBJECT WITHIN TEN (10) DAYS **WILL**
RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE
REVIEW.  Thomas v. Arn, 474 U.S. 140 (1985); United States v.
Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997); IUE AFL-CIO
Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank

v. Johnson, 986 F.2d 298, 300 (2d Cir.); Wesolek v. Canadair

Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714

F.2d 234, 237-238 (2d Cir. 1983).

Dated:   New York, New York
         December 8, 2008

                                    Respectfully submitted,


                                    HENRY PITMAN
                                    United States Magistrate Judge


Copies mailed to:

Paul T. Gentile, Esq.
Paul T. Gentile P.C.
261 Madison Avenue, 25th Floor
New York, New York   10015

Jaime A. Maurer, Esq.
Fowler White Boggs Banker P.A.
2201 Second Street, 5th Floor
Fort Myers, Florida   33901

Jeffrey S. Boxer, Esq.
Carter Ledyard & Milburn LLP
2 Wall Street
New York, New York   10005